

# SUPREME COURT OF ARKANSAS

**No.** CV-13-76

| | | |
|---|---|---|
| JOHN MOIX | | **Opinion Delivered** NOVEMBER 21, 2013 |
| | APPELLANT | |
| V. | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTEENTH DIVISION [NO. DR-2003-6439] |
| LIBBY MOIX | | |
| | APPELLEE | HONORABLE MACKIE M. PIERCE, JUDGE |
| | | REVERSED AND REMANDED. |

**CLIFF HOOFMAN, Associate Justice**

Appellant John Moix appeals from the circuit court's visitation order, which contained a provision prohibiting his long-term, domestic partner from being present during any overnight visitation with appellant's minor child. On appeal, appellant argues that the circuit court's order violated his state and federal constitutional rights to privacy and equal protection, and that the circuit court erred by finding that such a non-cohabitation restriction was required in the absence of any finding of harm to the child. Our jurisdiction is pursuant to Ark. R. Sup. Ct. 1-2(a)(1) and (b)(3)–(5) (2013). We reverse and remand.

John and Libby Moix were divorced in 2004. The divorce decree incorporated the parties' settlement agreement, which provided that the parties would share joint custody of their three sons, with appellee serving as the primary custodian and appellant receiving reasonable visitation. The settlement agreement also stated that neither party was to have

overnight guests of the opposite sex.

In May 2005, appellee filed a petition to modify visitation, alleging that since the entry of the divorce decree, appellant had been having a romantic relationship with a live-in male companion and that the children had been exposed to that relationship on multiple occasions. Appellee asserted that appellant and his partner had recently separated after they were involved in a physical altercation in which appellant was seriously injured, although they had since resumed their relationship and were again residing together. Appellee requested that, due to this change in circumstances, the circuit court grant her sole custody of the children and limit appellant's visitation in such a way as to limit the children's exposure to the illicit relationship and to the danger caused by the volatility of his companion. Appellant agreed to the entry of an order of modification, filed on July 18, 2005, which provided that the existing custody arrangement would continue with the two older twin boys, but that appellee would receive full custody of R.M., who was five years old at the time. The order also restricted appellant to visitation with R.M. on every other weekend and every Wednesday, with no overnight visitation.

Despite the agreed order modifying visitation, it is undisputed by the parties that the order was not followed and that appellant had liberal overnight visitation with R.M. until late 2009 or early 2010, when he became addicted to prescription drugs and sought inpatient treatment after being involved in a hit-and-run accident. After he completed his treatment, appellant was limited to daytime visitation at the discretion of appellee. In May 2012, appellant filed a motion for modification of visitation and child support, in which he alleged

2

SLIP OPINION

that appellee had remarried in 2010 and that she had informed him that R.M. had a new father and no longer needed him. Appellant asserted that the severe reduction in his visitation coincided with appellee's remarriage and that his son had expressed the desire to spend more time with him. Because there had been a material change in circumstances based on appellee's remarriage, her new husband usurping his role as father of R.M., and the fact that R.M. was now twelve years old and wished to spend more time with his father, appellant requested that the circuit court modify visitation to allow overnight visits, as well as holiday and extended summer visitation.

In her response, appellee denied that there had been a material change in circumstances or that it was in R.M.'s best interest to have increased visitation. She asserted that any change in appellant's circumstances had been detrimental, pointing to his arrest for driving while under the influence of prescription drugs and the fact that he had lost his pharmacist license. She further alleged that appellant's relationship with his boyfriend had been volatile and that it was not in R.M.'s best interest to have overnight visitation in such an environment.

At the hearing held on October 9, 2012, appellant testified that he had been a pharmacist for twenty-three years and that he had had previous problems with a prescription-drug addiction in 1993, although he had completed treatment and remained sober until his recent relapse subsequent to his divorce. He testified that he gradually relapsed from 2004 until February 2010, when he was arrested for a DWI after being involved in a hit-and-run accident. Appellant completed several months of inpatient treatment and testified that he had completely abstained from alcohol and prescription drugs since February 2010. He further

SLIP OPINION

testified that he was now under a ten-year contract with the pharmacy board, pursuant to which he had been able to regain his pharmacist license, and that he has to call every morning to see if he must undergo a drug screen. So far, appellant stated that he had undergone fifty-nine random drug screens, all of which had been negative. He testified that he has also been regularly attending AA and NA meetings as required under the contract.

With regard to his relationship with his partner, Chad Cornelius, appellant testified that they had been in a committed, monogamous relationship for at least seven years and that they had applied for a marriage license in Iowa. Appellant stated that he had enjoyed overnight visitation with R.M. for five years before appellee forbade it and that even though Chad had been present, R.M. had never been exposed to any type of romantic behavior between them. Appellant testified that he and Chad had never slept in the same bed during any of R.M.'s previous visits and that if overnight visitation were again allowed, he would continue to abstain from bed sharing or other romantic behavior in the presence of his son. Appellant stated that Chad has a son from his previous marriage who often stays overnight at their home and that R.M. and Chad's son have a close relationship that would be greatly hindered if Chad were not allowed to be present during any overnight visits. According to appellant, he and Chad had not had any altercations since the one in 2005, which did not occur in the presence of R.M., and he stated that Chad is a positive role model for his son. Appellant also noted that his two older sons had lived with him during their senior year in high school, that they continued to spend weekends at his home during college, and that one of his sons is moving back home. He testified that all of his children are happy and emotionally, mentally,

and physically stable.

Chad also testified and stated that he was a registered nurse at a hospital focusing on children and adolescents with behavioral–health issues. Chad testified that he has had to pass multiple state and federal background checks as a condition of his employment. He agreed that he and appellant had been in a committed relationship since 2005 and that they would like to get married. Chad also confirmed that he always slept in another room when R.M. visited. He testified that his sixteen-year-old son has a great relationship with R.M. Chad confirmed that appellant had been completely abstinent from drugs and alcohol since February 2010, and Chad stated that he personally does not drink alcohol in their home.

Jamie Moberly, a friend of Chad's and appellant's, testified that she used to be employed as a child-protective-services investigator and family service worker with the Arkansas Department of Human Services and that she is a licensed clinical social worker, who currently does home studies in connection with private adoptions. Moberly stated that she first met Chad through work and then got to know him, as well as appellant, through a church group. She testified that she had been in their home numerous times over the last several years and had witnessed their interaction with their children. According to Moberly, appellant is very loving and positive with his children, as well as her own daughter, and she stated that she would vouch for his good character. She testified that she had personal knowledge that appellant had been sober since 2010, that she has seen a difference in him since undergoing treatment and therapy, and that she has absolutely no concerns about his addiction at the current time. Moberly further testified that Chad is a great guy and a great



father, that he is very supportive of appellant and his children, and that she had never seen him be verbally or physically aggressive toward anyone. She stated that she was more familiar with appellant's and Chad's home than other homes where she has conducted home studies and indicated that there was absolutely nothing about their home that would cause her any concerns about placing a child there.

Reverend Betsy Snyder, a United Methodist pastor at the church where appellant and Chad attend, testified that she also knows them both well. She stated that Chad is a generous person with a high moral compass and that he is a very good father. She indicated that she had no concerns about her own children spending time with Chad and that she had not seen anything that would indicate a propensity toward verbal or physical abuse. Although Reverend Snyder testified that she did not know appellant quite as well as Chad, she stated that she had never seen anything to cause her concern with regard to his character or his morality.

Chad's ex-wife, Robyn Cornelius, also testified on behalf of appellant and Chad. She stated that Chad is a loving and supportive father to their two children and that they share custody of their son, who is still a minor. Robyn testified that she had never witnessed Chad being verbally or physically abusive. She also stated that she has known appellant for ten years and that he is one of the kindest persons that she has ever known. She testified that her children have a lot of interaction with him and that he has been a very positive influence on them. She described appellant as being kind and considerate to his children and stated that the court should have no concerns about overnight visitation. According to Robyn, after



having seen R.M. around appellant and Chad, she believed it was in R.M.'s best interest to have overnight visitation and that he would be negatively affected if he were not allowed to spend more time with his father.

The final witness to testify was appellee. She testified that she had obtained the 2005 modification order after she became concerned about appellant's and Chad's relationship and how it would affect R.M. She stated that appellant's relationship was not the sole reason why she was contesting his attempt to increase visitation. According to appellee, appellant had complained to her about Chad acting in a threatening and controlling manner, and she indicated that their relationship was unstable and unhealthy. She also indicated that she had found needles and vials of steroids in a guest bedroom of appellant's home while cleaning it in 2009 and that appellant had told her that Chad had a past history of steroid use. She testified that she would like to see appellant exhibit a longer period of being drug and alcohol free before allowing expanded visitation. Appellee further stated that appellant had shared information about the court proceedings with R.M., which she did not feel was appropriate. She admitted that R.M. had a loving relationship with his father and that it was important that they spend time together, but testified that it was not in R.M.'s best interest to have overnight or extended visitation at the present time due to his recent drug issues and his relationship with Chad.

In rebuttal testimony, appellant responded to appellee's allegation about finding needles and steroids in his home. He testified that he was not aware of these items, that he had never used intravenous drugs at any point, and that he was not aware that Chad had ever used them.

7

SLIP OPINION

The circuit court entered an order on November 14, 2012, granting appellant's motion for modification of visitation. The court found that there had been a material change in circumstances and that it was in R.M.'s best interest to have more time with his father. Appellant was awarded visitation on every other weekend, as well as one evening during the week, in addition to extended summer and holiday visitation. However, the court found that it was required by the public policy of this state to impose a non-cohabitation restriction preventing Chad from being present during any overnight visits. The court noted that appellant and Chad were in a long-term committed relationship, that they had resided together since at least 2007, and that Chad posed "no threat to the health, safety, or welfare" of R.M. Other than the prohibition on unmarried cohabitation with a romantic partner in the presence of a minor child, the circuit court found no other factors present to militate against overnight visitation in this case. The court further found that the non-cohabitation policy, and the mandatory application of that policy, survive both federal and state constitutional scrutiny. Appellant filed a timely notice of appeal from the circuit court's order.

In domestic relations cases, we review the evidence de novo and will not reverse the circuit court's findings unless they are clearly erroneous. *Brown v. Brown*, 2012 Ark. 89, 387 S.W.3d 159. We also give special deference to the circuit court's superior position in evaluating the witnesses, their testimony, and the child's best interest. *Id.* Because a circuit court maintains continuing jurisdiction over visitation, it may modify or vacate a prior visitation order when it becomes aware of a material change in circumstances since the previous order. *Id.* The party seeking modification has the burden of demonstrating such a

material change in circumstances. *Id.* With regard to visitation, the primary consideration is the best interest of the child. *Id.* Important factors for the court to consider in determining reasonable visitation are the wishes of the child, the capacity of the party desiring visitation to supervise and care for the child, problems of transportation and prior conduct in abusing visitation, the work schedule or stability of the parties, and relationship with siblings and other relatives. *Id.* We have held that fixing visitation rights is a matter that lies within the sound discretion of the circuit court. *Id.*

In his first two points on appeal, appellant argues that the non-cohabitation agreement imposed by the circuit court violates his federal and state constitutional rights to privacy and equal protection. However, because we find merit in appellant's final argument, there is no need to address these constitutional arguments. We have repeatedly held that if a case can be resolved without reaching a constitutional argument, it is our duty to do so. *Daniel v. Spivey*, 2012 Ark. 39, 386 S.W.3d 424; *Solis v. State*, 371 Ark. 590, 269 S.W.3d 352 (2007); *Haase v. Starnes*, 323 Ark. 263, 915 S.W.2d 675 (1996).

In his third and final point on appeal, appellant argues that, contrary to the circuit court's belief, our prior cases do not require the imposition of non-cohabitation provisions in the absence of any finding of evidence of harm to the minor child. Appellee responds that this argument is not preserved for our review because it was not raised to the circuit court. We disagree. At the hearing, when appellant was discussing our decision in *Arkansas Department of Human Services v. Cole*, 2011 Ark. 145, 380 S.W.3d 429, he specifically argued that non-cohabitation provisions in custody cases are "not a blanket rule," and that it is a

SLIP OPINION

"case by case determination, whether it's a bad thing or a good thing in a particular case."

Thus, we find that this argument is properly preserved for our review.

As the circuit court in this case recognized, under the long-standing public policy of the courts in this state, a parent's extramarital cohabitation with a romantic partner in the presence of children, or a parent's promiscuous conduct or lifestyle, has never been condoned. *See, e.g.*, *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005); *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003); *Campbell v. Campbell*, 336 Ark. 379, 985 S.W.2d 724 (1999). In *Campbell, supra,* this court made it clear that the purpose of non-cohabitation provisions are to promote a stable environment for the children and not merely to monitor a parent's sexual conduct.

We have also repeatedly held, however, that the primary consideration in domestic relations cases is the welfare and best interest of the children and that all other considerations are secondary. *See, e.g.*, *Alphin*, *supra*; *Taylor*, *supra*; *see also* Ark. Code Ann. § 9-13-101 (Repl. 2009). Therefore, we have emphasized in more recent cases that the policy against romantic cohabitation in the presence of children must be considered under the circumstances of each particular case and in light of the best interest of the children. For example, in *Taylor*, *supra*, we reversed the trial court's modification of custody where the finding of a material change in circumstances was based on the trial court's concern about protecting the children from future harm based on public misperception. In that case, the evidence showed that the custodial parent resided with a lesbian woman and that the two sometimes shared a bed, although they denied a romantic or sexual relationship. *Id.* We cited cases from other states

10

in support of the proposition that there must be concrete proof of likely harm to the children

from the parent's living arrangement before a change in custody can be made. *Id*. We held

that "evidence-based factors must govern," rather than stereotypical presumptions of future

harm. *Id*. at 83, 110 S.W.3d at 739.

We further discussed the issue of non-cohabitation agreements in *Arkansas Department

of Human Services v. Cole*, 2011 Ark. 145, 380 S.W.3d 429. In *Cole*, we held that the Arkansas

Adoption and Foster Care Act of 2008 (Act 1), which prohibited an individual from adopting

or serving as a foster parent if that individual was cohabiting with a sexual partner outside of

marriage, was unconstitutional because it violated the fundamental right to privacy implicit

in the Arkansas Constitution. In response to the appellants' argument in that case that our

holding would render non-cohabitation agreements in custody or dependency-neglect cases

unenforceable, we stated the following:

> We strongly disagree with the State and FCAC's conclusion that if this court
> finds that the categorical ban on adoption and fostering for sexual cohabitors put in
> place by Act 1 violates an individual's fundamental right to sexual privacy in one's
> home, state courts and DHS will be prohibited henceforth from considering and
> enforcing non-cohabitation agreements and orders in deciding child-custody and
> visitation cases as well as dependency-neglect cases. That simply is not the case. The
> overriding concern in all of these situations is the best interest of the child. *To arrive at
> what is in the child's best interest, the circuit courts and state agencies look at all the factors,
> including a non-cohabitation order if one exists, and make the best-interest determination on a
> case-by-case basis.* Act 1's blanket ban provides for no such individualized consideration
> or case-by-case analysis in adoption or foster-care cases and makes the bald assumption
> that in all cases where adoption or foster care is the issue it is always against the best
> interest of the child to be placed in a home where an individual is cohabiting with a
> sexual partner outside of marriage.
>
> But in addition to case-by-case analysis, there is another difference between
> cohabitation in the child-custody or dependency-neglect context and cohabiting sexual

SLIP OPINION

partners who wish to adopt or become foster parents. Third-party strangers who cohabit with a divorced parent are unknown in many cases to the circuit court and have not undergone the rigorous screening associated with foster care or adoption. By everyone's account, applicants for foster care must comply with a raft of DHS regulations that include criminal background checks, home studies, family histories, support systems, and the like. Adoption, under the auspices of the trial court, requires similar screening. Unsuitable and undesirable adoptive and foster parents are thereby weeded out in the screening process. The same does not pertain to a third-party stranger who cohabits with a divorced or single parent.

*Id.* at 16–17, 380 S.W.3d 438 (emphasis added) (internal citations omitted). Thus, we agree with appellant that the public policy against romantic cohabitation is not a "blanket ban," as it may not override the primary consideration for the circuit court in such cases, which is determining what is in the best interest of the children involved.

In the present case, the circuit court found from the evidence presented that appellant and his partner are in a long-term, committed romantic relationship and that "Mr. Cornelius poses no threat to the health, safety, or welfare of the minor child." The court further found that, "[o]ther than the prohibition of unmarried cohabitation with a romantic partner in the presence of the minor child, there are no other factors that would militate against overnight visitation." However, because the circuit court also stated that the mandatory application of our public policy against unmarried cohabitation required it to include a non-cohabitation provision, it made no finding on whether such a provision was in the best interest of R.M. Therefore, we reverse and remand for the circuit court to make this determination.

We also note that appellee contends in her brief that this court can resolve the case on the basis that the circuit court erred in finding a material change in circumstances had occurred justifying modification of the previous visitation order. However, she did not file

SLIP OPINION

a notice of cross-appeal from the circuit court's order, and thus, we lack jurisdiction to address this argument. A notice of cross-appeal is necessary when an appellee seeks something more than he or she received in the lower court. *Boothe v. Boothe*, 341 Ark. 381, 17 S.W.3d 464 (2000); *Brown v. Minor*, 305 Ark. 556, 810 S.W.2d 334 (1991).

Reversed and remanded.

BAKER, GOODSON, and HART, JJ., dissent.

**KAREN R. BAKER, Justice, dissenting.** Because I believe that the majority errs in its disposition of this case, I must dissent.

The majority states that we lack jurisdiction to address Libby's assertion that the circuit court erred in finding that there was a material change in circumstances, stating that a notice of cross-appeal is necessary when an appellee seeks something more than he or she received in the lower court. However, here, it is John who seeks something more than he received in the lower court. Libby seeks only to have the circuit court's order affirmed. Thus, the cases cited by the majority stating that we do not have jurisdiction are inapposite.

Further, our standard of review in child-visitation cases is de novo on the record. *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). In determining whether the circuit judge clearly erred in a finding, the appellate court may look to the whole record to reach that decision. *Id.* A complete review of the evidence and record may take place as part of the appellate review to determine whether the trial court clearly erred in either making a finding of fact or in failing to do so. *Id.* We may, therefore, review the record and the evidence presented to determine whether a material change in circumstances has occurred.

13

SLIP OPINION

To require Libby to bring a cross-appeal in order to give this court jurisdiction to review a finding of the circuit court in a case under a de novo standard of review stands in direct contention with that standard of review, particularly when the appellee, as in this case, simply wants this court to uphold the order as issued. I would, therefore, review the circuit court's finding that there was a material change in circumstances. In doing so, I am left with the definite and firm conviction that a mistake has been made.

The appellant asserted that there were numerous material changes in circumstances since the 2005 order: that the appellee had remarried, that R.M. was substantially older, and that, while appellee allowed appellant overnight visitation with R.M. after the decree had been entered, appellee stopped allowing overnight visitation as of 2010. While the court's order does not specify the exact material changes in circumstances that the circuit court found, the transcript of the hearing makes it clear that the circuit court found the fact that Libby stopped allowing overnight visitation and the fact that appellant was treating his drug and alcohol addiction and bipolar disorder in an appropriate manner were the material changes in circumstances that the circuit court found compelling.

Courts impose a more stringent standard for modifications in visitation. *Brown v. Brown*, 2012 Ark. 89, 387 S.W.3d 159. The reasons for requiring these more stringent standards are to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issue. *Id.* Based on these more stringent standards, none of the changes alleged by John or upon which the circuit court based its ruling constitute a material change in circumstances.



The circuit court focused on the fact that Libby had stopped allowing John overnight visitation. However, I do not agree that this constituted a material change in circumstances. Libby had the authority to deny John overnight visitation with R.M. from the time the agreed order was entered in 2005. The fact that she began to exercise that authority is not a material change in circumstances. Further, Libby should not be punished now for allowing John more visitation than was provided for in the agreed order.

Similarly, I cannot say that the fact that appellant has gone through treatment for his drug and alcohol addiction and for his bipolar disorder constitutes a material change in circumstances. The 2005 order John seeks to modify does not mention his drug and alcohol addiction, or his bipolar disorder. The motion to modify the divorce decree filed by Libby that led to the 2005 order states that the reason for the modification is John's cohabitation with a romantic partner. In fact, Libby testified that at the time of the 2005 order she was unaware of John's drug use. A noncustodial parent cannot use circumstances that they created as an excuse to modify visitation. *Brown v. Brown*, *supra*. John argues that the fact that he is treating his addiction is a material change in circumstances, when he created the circumstance of his addiction, which was unknown to the circuit court and Libby at the time the previous agreed order was entered.

For these reasons, the circuit court clearly erred in finding that there had been a material change in circumstances. Normally, this would be grounds for reversal, however, that is not the relief that Libby seeks. Libby does not ask us to modify the circuit court's visitation order. Instead, it is John who asks us to modify the order and strike the

SLIP OPINION

noncohabitation provision, by arguing that there was no finding of harm to the child or analysis of the child's best interest. However, the best-interest analysis is not reached when there has been no material change in circumstances. *Id.*, at 11, 387 S.W.3d at 165 (explaining that no finding on the best interest of the child is required when there has been no material change in circumstances warranting a modification of visitation). As there has been no material change in circumstances, we should not reach John's arguments. Therefore, I would affirm the circuit court's order.

While my analysis would go no further, I must note that the majority errs in holding that the circuit court imposed the noncohabitation provision without determining whether such a provision was in the best interest of the child. The circuit court stated, in speaking about the noncohabitation provision: "*The best interest dictates* that that be the continued policy of this court, in my opinion. So that will be the order of the court." (Emphasis added.) It is clear to me that the circuit court did determine that the noncohabitation provision was in the best interest of the child.

HART, J., joins in this dissent.

**COURTNEY HUDSON GOODSON, Justice, dissenting.** The majority in this case finds error in the circuit court's conclusion that the restriction on overnight visitation was in the best interest of the child. I must dissent.

Arkansas's appellate courts have steadfastly upheld chancery court orders that prohibit parents from allowing romantic partners to stay or reside in the home when the children are present. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001) (citing *Campbell v. Campbell*,

SLIP OPINION

336 Ark. 379, 985 S.W.2d 724 (1999).  This court has gone so far as to say that "a parent's unmarried cohabitation with a romantic partner, or a parent's promiscuous conduct or lifestyle, *in the presence of a child* cannot be abided." *Taylor v. Taylor*, 353 Ark. 69, 80, 110 S.W.3d 731, 737 (2003) (emphasis supplied); *see also Campbell*, *supra*; *Walker v. Walker*, 262 Ark. 648, 559 S.W.2d 716 (1978).  This rule has been applied regardless of whether the parent is heterosexual or homosexual.  *See Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001); *Campbell*, *supra*.  The laudable purpose of the prohibition is to promote a stable environment for children; it is not imposed merely to monitor a parent's sexual conduct.  *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999).

In our 2001 decision in *Taylor*, *supra*, this court affirmed the circuit court's requirement that the mother's female sexual companion move out of the home as a condition of retaining custody of her children.  *Taylor*, 345 Ark. 300, 47 S.W.3d 222.  There was no showing of harm occasioned by the companion's presence, as the circuit court expressed the willingness to allow the companion to babysit when the mother was at work.  Nonetheless, we held that the circuit court acted within its authority and was not clearly erroneous in determining that it was not in the children's best interests for the mother to continue cohabitating with another adult with whom she was romantically involved.  This court said,

> As emphasized by our court's earlier decisions, the trial court's use of the non–cohabitation restriction is a material factor to consider when determining custody issues.  Such a restriction or prohibition aids in structuring the home place so as to reduce the possibilities (or opportunities) where children may be present and subjected to a single parent's sexual encounters, whether they be heterosexual or homosexual.

17

*Taylor*, 345 Ark. at 304–305, 47 S.W.3d at 225.

We have not completely abandoned the restriction in subsequent caselaw. In *Arkansas Department of Human Services v. Cole*, 2011 Ark. 145, 380 S.W.3d 429, this court determined that Act 1's categorical ban prohibiting sexual cohabitors from adopting or fostering children was unconstitutional as a violation of the fundamental right of privacy found in the Arkansas Constitution. However, we did not disavow the restriction on overnight romantic guests, as we expressly rejected the argument that striking down the categorical ban would prevent our courts from considering and enforcing non-cohabitation orders and agreements in domestic-relations cases.

The primary consideration regarding visitation is the best interest of the child. *Baber v. Baber*, 2011 Ark. 40, 378 S.W.3d 699. In its oral ruling from the bench, the circuit court recognized this guiding principle. The court also recognized the settled law permitting the imposition of a restriction on overnight visitation in the presence of sexual partners. Contrary to the majority's assertion, the circuit court did not neglect to make a determination that the restriction was in the best interest of the child. The court quite plainly stated that "the best interest dictates that that be the continued policy of the Court" to not permit overnight visitation in the presence of the child. I would affirm the circuit court's decision in keeping with our time-tested law. The court acted well within in its authority to conclude that the restriction promoted the best interest of this child.

HART, J., joins.

*Wagoner Law Firm, P.A.*, by: *Jack Wagoner, III*, and *R. Keith Pike*;
*Holly Dickson*, The Arkansas Civil Liberties Foundation Inc.; and
*Leslie Cooper* and *James Esseks*, The American Civil Liberties Union Foundation, pro hac vice, for appellant.

*Worsham Law Firm, P.A.*, by: *Richard E. Worsham*, for appellee.